# United States District Court
## For The Middle DIstrict of Florida
## Tampa Division

Blake Warner

v.

Case Number

CORSON REALTY GROUP, INC. D/B/A
BAY RIDGE PROPERTY MANAGEMENT,
MALLORY SQUARE CONDOMINIUM
ASSOCIATION OF TAMPA, INC.,
Antonio Ruggieri

Jury Trial Demanded

## Complaint

## I   Introduction

1. Now Comes Plaintiff, Blake A. Warner, Pro-Se, with a Complaint against Defendants MALLORY SQUARE CONDOMINIUM ASSOCIATION OF TAMPA, INC. ("HOA"), CORSON REALTY GROUP, INC. D/B/A BAY RIDGE PROPERTY MANAGEMENT ("Bay Ridge"), and Antonio Ruggieri ("Landlord") pursuant 42 U.S.C. § 3601 et seq "Fair Housing Act", Fla. Stat. §§ 760 "Florida Fair Housing Act Act.", and Fla. Stat. §§ 83 "Florida Residential Landlord and Tenant Act.", by discriminating against Plaintiff on the basis of familial status; race; and disability. This action also raises claims under 15 U.S.C. § 1681 et seq "Fair Credit Reporting Act".

## II   Plaintiff

2. Plaintiff is a United States citizen.

3. Plaintiff has leased and resided at Mallory Square Unit C8 in, Tampa, Florida since May 2019.

4. Plaintiff is a "consumer" as defined in Section 1681a(c) of the Fair Credit Reporting Act.

5. Plaintiff and his child are "aggrieved persons," as defined by 42 U.S.C. § 3602(i).

6. Plaintiff is African-American.

7. Plaintiff has Autism Spectrum Disorder ("ASD"), which is a mental impairment that substantially limits one or more major life activity.

## III   DEFENDANTS

8. HENCESFORTH, "Defendants" refers to CORSON REALTY GROUP, INC., BAY RIDGE PROPERTY MANAGEMENT, MALLORY SQUARE CONDOMINIUM ASSOCIATION OF TAMPA, INC., and Antonio Ruggieri.

## 1.   MALLORY SQUARE CONDOMINIUM ASSOCIATION OF TAMPA, INC.

9. MALLORY SQUARE CONDOMINIUM ASSOCIATION OF TAMPA, INC.–hereafter "HOA"–does business exclusively in Hillsborough County Florida.

10. Plaintiff has continually leased Mallory Square Unit C8 since May 2019.

11. MALLORY SQUARE CONDOMINIUM ASSOCIATION OF TAMPA, INC. is registered with the Florida Division of Corporations, under document number P98000011136.

12. Defendant MALLORY SQUARE CONDOMINIUM ASSOCIATION OF TAMPA, INC. ("HOA") is a not-for profit Florida corporation with its principal place of business in Tampa, Florida.  Defendant HOA is a homeowners association that has been in existence since 1989 and that is managed by a Board of Directors ("Board) comprised of residents of Mallory Square Condominiums ("Mallory Square"), Defendant HOA is responsible, among other things, for establishing, modifying and enforcing the rules and policies at Mallory Square; reviewing and

2

approving residential leases and tenants; fixing, collecting and enforcing assessments and fines; hiring personnel and entering into agreements with contractors for the management and maintenance of Mallory Square, prescribing their duties, and delegating appropriate authorities to them; and performing all other legal duties of a homeowners association, as delineated in the applicable Declaration, Articles of Incorporation, and By-Laws.

## 2.  CORSON REALTY GROUP, INC

13. Defendant CORSON REALTY GROUP, INC. D/B/A BAY RIDGE PROPERTY MANAGEMENT ("Bay Ridge") is a for-profit Florida corporation with its principal place of business in Tampa, Florida. Defendant Bay Ridge served as Property Manager at Mallory Square under contract with Defendant HOA at times relevant to this Complaint. As an agent of Defendant HOA, Defendant Bay Ridge was responsible, inter-alia, for reviewing and approving residential lease applications at Mallory Square, corresponding with owners and tenants regarding Mallory Square regarding rules and policies, collecting and enforcing assessments and fines, making decisions concerning the management and maintenance Mallory Square, and advising Defendant HOA and its Board regarding a wide variety of matters relating to the operation of Mallory Square.

## 3.  ANTONIO RUGGIERI

14. Defendant Antonio Ruggieri ("Landlord") is a private individual who owns Mallory Square Unit C8, located in Tampa, FL. On or about May 2019, Landlord entered into a lease agreement with Plaintiff for possession and use of Mallory Square Unit C8.

## IV   Jurisdiction

15.  This Court has subject matter jurisdiction under:

   (a)  28 U.S.C. § 1331 (federal question).

   (b)  28 U.S.C. § 1391 (venue)

   (c)  42 U.S.C. § 3613(A)(1)(A) "Fair Housing Act"

   (d)  15 U.S.C. § 1681p "Fair Credit Reporting Act"

   (e)  42 U.S.C. § 12133 "Americans With Disability Act"

   (f)  Supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367

   (g)  Fla. Stat. §§ 83.54

   (h)  Fla. Stat. §§ 760.35

16.  This venue is appropriate because at all relevant times to this litigation, Plaintiff resided in this judicial district, and all conduct complained of, occurred in this judicial district.

## Facts

### Autism

17.  Sensory issues often accompany autism.

18.  Autism's sensory issues can involve both hyper-sensitivities (over-responsiveness) and hypo-sensitivities (under-responsiveness) to a wide range of stimuli including: sights, sounds, smells, tastes, touch, balance, and body awareness.

19.  Generally, people with autism have rigid patterns of thinking.

20.  Their tendency to follow rules and routines often causes problems for adaptive functioning, including daily living skills, communication, and social interactions.

21. Their tendency to insist upon the same routine or environment and be distressed if the sameness is broken by unexpected changes or people.

22. Their tendency to insist on rules being followed to create the same routine or environment that is expected, and become distressed if those rules are not followed or are unequally applied.

## ADA: PUBLIC ACCOMMODATION

23. The common areas within Mallory Square are not limited exclusively to owners, residents, and their guests.

24. Specifically, the HOA gives gate keys to United States Postal Service workers and invites them onto the property to deliver mail.

25. Additionally, gate codes are given by the HOA to UPS, FedEX, Amazon, and other non-member entities for the purposes of using their common areas.

## HOA CC&R, BYLAWS, AND RULES

Noise Regulations -Disturbances including but not limited to parties, music, etc. are not permitted before 8 AM or after 10 PM weekdays and 11 PM Friday and Saturday nights. Disturbances are defined as any sound that emits beyond your condo unit and affects the quality of life of your neighbors. Residents are asked to act with special consideration when returning to the unit late at night, especially those who live on the second and third floor. Noises echo in the evening hours. (HOA Welcome Letter)

Common Areas - Common areas such as walkways, stair wells and parking areas must be kept clean and clear of obstructions at all time. Garbage may not be left in the common areas. Cigarette butts must be disposed of properly and not thrown in the landscaping, or other common areas. The personal

property, other than the automobile of residents, shall not be stored outside the respective units. (HOA Welcome Letter)

No nuisances (as defined by the Association) shall be allowed on the Condominium Property, nor shall any use or practice be allowed which is a source of annoyance to residents or occupants of Units or which interferes with the peaceful possession or proper use of the Condominium Property by its residents or occupants. (CC&R 17.5 Nuisances)

No improper, offensive, hazardous or unlawful use shall be made of the Condominium Property or any part thereof, and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction thereover shall be observed. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereover, relating to any portion of the Condominium Property shall be corrected by, and at the sole expense of, the party obligated to maintain or repair such portion of the Condominium Property, as elsewhere herein set forth.  (CC&R 17.6 No Improper Uses)

The failure of the Association or any Unit Owner to enforce any covenant, restriction, or other provision of the Act, this Declaration, the exhibits annexed hereto, or the rules and regulations adopted pursuant to said documents, as the same may be amended from time to time, shall not constitute a waiver of their right to do so thereafter. (CC&R 18.4 No Waiver of Rights)

The sidewalks, entrances, passages, and like portions of the Common Elements shall not be obstructed nor used for any purpose other than for ingress and egress to and from the Condominium Property and Condominium Parcels; nor shall any carts, bicycles, carriages, chairs, tables or any other similar objects obstruct such ingress and egress therein. (Rules and Regulations 1)

No Unit Owner shall make or permit any disturbing noises in the Building by himself or his family, servants, employees, agents, visitors or licenses, nor permit any conduct by such persons that will interfere with the rights, comforts or conveniences of other Unit Owners.  No Unit Owner shall play or permit to be played any musical instrument, nor operator or permit to be operated a phonograph, television, radio or sound amplifier in his Unit in such a manner as to disturb or annoy other residents. No Unit Owner shall conduct, nor permit to be conducted, vocal or instrumental instruction at any time which disturbs other residents. (Rules and Regulations 8)

"A Unit Owner shall not cause anything to be affixed or attached to, hung, displayed or placed on the exterior walls, doors, balconies or windows of the Building." (Rules and Regulations 17)

34. ??

Children will be the direct responsibility of their parents or legal guardians, including full supervision of them while within Condominium Property and including full compliance by them of these Rules and Regulations and all other rules and regulations of the Association. (Rules and Regulations 23)

## Events

35. The subject property, Mallory Square, is a 52-unit condominium complex, ranging of two-bedroom units.

36. On 04-09-2019, Plaintiff applied to rent Mallory Square Unit C8 from Landlord with his then seven year old child, after responding to an advertisement placed on the internet website craigslist.org.

37. On 04-19-2019, Plaintiff was informed by Landlord's agent that HOA had denied his application due to criminal history reported on the background check.

38. Plaintiff immediately exercised his right to dispute the report under the Fair Credit Reporting Act ("FCRA").

39. On 05-14-2019, TransUnion removed the disputed criminal history from Plaintiff's background check, and stated: "Additionally, we have provided notification of this dispute resolution and final outcome to our customer Sam Corson.  Per Section 611 (d) of the Fair Credit Reporting Act...".

40. Despite the fact that Plaintiff now cleared the background check, Defendant was forced by Defendants to apply, and pay for, a second background check.

41. Defendant paid for, and subsequently passed the second background check, and was then allowed to move in after signing a one year lease.

42. On or about 02-21-2020, Plaintiff and Landlord renewed their lease through 04-30-2021.

43. On 03-21-2020, as the COVID-19 pandemic was ramping up and communities across the country were closing their common areas and locking down communities to protect them, a resident decided to throw a pool party and invite many friends over.  Plaintiff contacted the HOA to complain about the party, and the risk of infection that it exposed the community to.

44. On 03-23-2020, the HOA responded that it would bring the matter to the attention of the board.

45. Shortly thereafter, the HOA enacted a rule that forbade guests in the common areas, but did not address the issue of occupancy inside of the units.

46. Residents continued to throw high occupancy parties inside of their units, during and after the height of the pandemic, which the HOA failed to address.

47. The residents that are throwing these parties are young not-a-risk people who are putting Plaintiff's family at risk.

48. On 08-11-2020, Landlord asked Plaintiff "PS....just curious...are you an attorney?" to which Plaintiff responded "I am not an attorney, just autistic".

49. On or about early August 2020, the HOA issued a noise violation to another unit in building E, for their 7-year old child emitting noise when waking up in the middle of the night with night terrors.

50. Plaintiff's child is close friends with the child that resides in this unit, and is often inside of that unit, including sleep overs.

51. Plaintiff's child also occasionally wakes up with nightmares and emits "noise".

52. On 08-10-2020, Plaintiff sent the following email to the HOA seeking clarification of their rules on noise complaints with respect to children:

    Hello Linda,

    I was concerned when I heard from some parents at Mallory Square that the HOA is issuing noise complaints against a single mother and a 7 year old for what appear to be normal 7 year old noises.

    As a resident with a young child who also exhibits normal 7 year old sounds, this has me concerned that I could also be issued a noise complaint merely for my son existing.

    So if you could, please give me many detailed examples of what is, and is not acceptable noise emissions from a 7 year old so I can be put on notice of what is, and is not acceptable behavior, it would be greatly appreciated.

    Best Regards, -Blake (Plaintiff)

53. As of the filing of this complaint, the HOA has not responded to that inquiry.

54. On 08-21-2020 at approximately 8:30PM, Unit C5 threw a high occupancy party directly across from Plaintiff's residence.

55. Plaintiff politely asked unit C5 to lower the volume of the party, and which point the intoxicated resident and her intoxicated guests started exhibiting belligerent

and disorderly behavior towards Plaintiff outside of Plaintiff's front door, in the presence of his son.

56. Plaintiff immediately contacted Defendants, who initially were dismissive and stated there was nothing they could do.

57. Plaintiff sent the following email to Defendants:

Hello Bay Ridge,

At approx 8:30PM on 08-21-2020, Mallory Square Unit C5 started to throw a party. The party grew louder and louder to the point where I could not focus at my desk (close to their unit). So I moved to my bedroom which is the furthest part of my unit away from theirs. I could still hear them, but it was tolerable enough to avoid confrontation. At approx 9:30PM, the noise grew so loud it was intolerable even in my bedroom. Furthermore, they were using language that was not appropriate for my son, that we could hear clear as day in our unit. I walked around outside their unit, counted the people I could see on their deck, and the voices I heard, there were more than 10 people in that small 750 sq ft unit. Clearly none were social distancing, and none were wearing masks, and alcohol was being consumed. There were at least 4 children inside of the unit as well.

So I knocked on her door, and asked her to please lower the volume. I recorded the entire encounter (attached below karen1.mpg) to protect myself from false allegations. In the video, you can see that I respectfully asked her to lower the volume, and she voiced no opposition at the time. I went home, the volume went down. Things were fine for awhile.

Then the volume skyrocketed back up. I opened my door and while I was standing in my own doorway, a person named Eva, who isn't even a resident here (she is a frequent guest of Heidi in building D) confronts me aggressively and starts arguing with me about the noise. Eventually the resident of the

unit, Diedre, comes out. I try to explain to them that they are being very loud and they are yelling in the hallway. When I bring up the health concerns with having so many people in the unit during covid, they start cursing at me, saying "we are all health care workers". There are at least 4 children in their unit, and my son is in my unit. This was all records (karen2.mpg), and when I enter my home, you hear my son ask what that noise was. He heard them cussing at me (as did their own children).

I called the police, the police came and broke up the party (most people left). After the police left, they started being loud again, her guests started kicking my wall, and cursing outside my door. I had to move my son into his bedroom, and turn on a movie really loud to drown out the noises.

By throwing covid parties, they are not only endangering my family's health, they are endangering the health of every person in the unit. And on top of that, they are healthcare workers–they are endangering the health of everyone in their respective medical facilities.

I would like to know what the HOA is going to do about this, I plan to post the videos to social media explaining why covid is exploding in Florida / Tampa.

I do not feel safe in my own home.

-Blake (Plaintiff)

58. The HOA responded with the following email: "Sorry for this; but according to the video it was not after the quiet hours so I cannot send a noise violation to them." (Linda Lima)

59. After some back and forth citing city noise ordinances and other laws, The HOA only agreed to "talk" to Unit C5 after several threats of legal action including FHA violations.

60. Additionally, the HOA stated:

Please continue to document and report any violations of the Mallory Square rules and regulations. I would caution you however about making audio and video recordings of other residents without their knowledge or consent. Because those videos you sent do not give the impression the residents of C5 knew they were being recorded let alone granted their consent, I cannot use them in any way. (Sam Corson)

61. The video was recorded in a common area public hallway where there is no expectation of privacy.

62. It is well settled law that consent is not required to record in public areas where there is no expectation of privacy.

63. Sam Corson was incorrect when he stated that the video could not be used in any way because it appeared to lack consent.

64. America has a long history of racism stemming from false allegations against African-Americans, especially from Caucasians.

65. Plaintiff has previously been a victim of such false allegations stemming from racism.

66. Despite the fact that Plaintiff informed the HOA that the video was recorded to protect himself from false allegations, Defendants actively tried to discourage Plaintiff from legally recording public encounters to protect himself from discrimination.

67. To the best of Plaintiff's knowledge, no substantive action was taken to address the issue.

68. On 09-28-2020, Plaintiff noticed a video camera had been affixed to an exterior wall and pointed at Plaintiff's residence.

69. Plaintiff, having knowledge that anything affixed to exterior walls must be approved by the HOA, contacted the HOA to inquire about the camera and whether it was authorized.

70. The HOA confirmed that board approval was required to affix the camera, but failed to respond to whether they had authorized the camera that was now pointed at Plaintiff's residence.

71. On 10-22-2020, Plaintiff sent the following text messages to another resident:

"Hey, *redacted* keeps breaking things.  He just killed a healthy tree.  He keeps pulling and swinging on things. Second tree he's hurt/killed" (Plaintiff)

"And he was swinging on the light post, pulling it off it's base" (Plaintiff)

"No worries, I've told him several times not to do it and he keeps doing it.  I just don't want someone to get the hoa involved, quite a few people here do not like kids" (Plaintiff)

72. The referenced child was not the child that originally dislodged the light post, however this child was large enough to continue to dislodge it more.

73. Once the light post had been dislodged by the first group of children, most every other child had been observed grabbing, pulling, and/or climbing on that light post.

74. Plaintiff has not observed any children exhibiting any of this behavior towards any undamaged light posts.

75. On 10-23-2020, Plaintiff filed a complaint with the HOA over a bicycle in the hallway in violation of the community's bylaws and City of Tampa fire code.

76. The HOA had previously sent out an email on this very topic on 07-06-2020:

All,

This is another friendly reminder that no personal items are not allowed to be stored in any common area of the property.

NO bikes are to be stored under the stairs per the fire marshal; if you have a bike under the stairs it will be removed!

13

If you have any questions or concerns please feel free to give us a call. (Linda Lima)

77. The HOA also has the following rule stated in the welcome letter:

Balconies/Porches –No resident shall permit anything to fall from a window or door of the property.  All plants and other items must be secured on the balcony and no plants or other item shall be permitted on a ledge.  No linens, cloths, clothing, curtains, rugs, mops, towels, or laundry of any kinds, or other articles, shall be shaken or hung from any of the windows, balconies or other portions of the condominium property.  No bicycles shall be left in entry ways, common areas, or under stairs.  (Mallory Square Condominiums Welcome Letter)

78. HOA never responded to the complaint.

79. On 10-26-2020, the HOA sent the following email to Plaintiff (and presumably to other residents):

All,
There are children unsupervised running around the complex destroying the landscape and breaking the light poles in the complex and in the pool without an adult.
This is unacceptable and the parents will be fined and charged for the repair of the light pole and restoring the landscaping.
All children need to be supervised and are not allowed in the pool without an adult.  (Bay Ridge Property Management)

80. On 10-27-2020, the HOA sent Plaintiff and Landlord the following violation:

YOU ARE HEREBY NOTIFIED THAT YOU OR YOUR GUESTS ARE IN VOILATION OF CONDOMINIUM ASSOCIATION RULES AND REG-ULATIONS. We have received multiple complaints of your child running

around unsupervised and being destructive around the complex. See attached photos. We are getting quotes to have the items fixed and we will be sending the invoice to you.  Also, no children are to be in the pool/pool area or clubhouse without adult supervision. If this behavior continues in the future, this action may include one or all of the following: fines, reporting of this disturbance to authorities, and legal action against you, your guests or your tenants. (Sam Corson)

81. The email which the violation was attached stated:

See attached violation notice and photos of your son and the damage he caused around the community.

We are in the process of dealing with the other parents as well but we are getting quotes to have the landscape fixed; the light pole fixed and the invoice will be sent to you for payment.

We expect your child and the others who we are contacting to go out and sweep the shell back into the beds.

No children are to be in the pool area/pool/ and or club house without adult supervision. If your child is seen in these areas you will be fined.

We expect this to not happen again; we do have multiple residents complaining about these kids running around unsupervised and destroying the Associations property. (Linda Lima)

82. The first image contained some plant stems broken–no children pictured.

83. The second image contained crushed sea shells on a brick sidewalk–no children pictured.

84. The third image contained a fallen tree–no children are pictured. This is the same fallen tree that was referenced in Plaintiff's text message the prior week.

85. The fourth photo contained the cement foundation of a light post that appears to have been dislodged. This is the same damaged light post that was referenced in Plaintiff's text message the prior week.

86. The fifth photo contained Plaintiff's son grabbing onto a listing light post with both hands, with one foot on the ground and one foot on the lower end of the base as if attempting to climb, as another child is watching. This is the same damaged light post that was referenced in Plaintiff's text message the prior week.

87. Plaintiff denied all of the allegations in the Violation Notice, and refused to pay any of the money demanded.

88. On 10-28-2020, After HOA refused to remove the previously reported bicycle in violation of its own bylaws and local laws, Plaintiff emailed a City of Tampa Fire Marshal. Plaintiff then forwarded this email to Defendants.

89. A short time later, the bicycle was removed.

90. On 10-30-2020, Plaintiff reported the HOA to the City of Tampa for failing to pull required permits for a pool renovation, and then informing Defendants of this violation.

91. On 10-30-2020, Plaintiff reported the HOA to the City of Tampa for code violations, and then informed Defendants that he had done so.

92. On 10-30-2020, Plaintiff reported various property maintenance issues including, but not limited to, overgrown vegetation, clogged storm gutters, bare electrical wires strung across the ground, broke exterior fence, broken security gates, etc.

93. On 10-30-2020, The HOA sent the Plaintiff the following email:

Blake,

Thank you for bringing all these matters to our attention. We take these concerns seriously and will advise the Board accordingly and take necessary and appropriate action.

If all residents follow the rules and act with respect for the common property, Mallory Square will continue to be a pleasant place for all parties to reside. (Sam Corson)

94. On 11-02-2020, Plaintiff sent the following email to the HOA:

This has been an on-going issue with Mallory Square B4. Extremely loud talking / laughing / clapping. It started tonight around 7:30, by 8PM I started recording. I used a decibel meter to confirm they were over 60 decibels, at times reaching over 80 in violation of City of Tampa noise ordinances. Additionally, they are having conversations / language that are inappropriate for a young child, that we can hear clear as day in our unit. They were saying "nigger", "fuck", "shit", "ass" etc. Even absent the noise level, the language is inappropriate when I cannot escape it from my own unit. This is a school night, lots of people here have children who need to sleep.

Be that as it may, you need not rely on city of tampa ordinances or language along to cite them, they kept going past 10PM. First recording was taken around 8PM, second recording was taken at 10:05 PM. As I write this email at 10:18PM, I can still hear them talking and laughing clear as day in my unit. Best Regards, -Blake (Plaintiff)

95. Quickly followed by another email: "It is now 11:10PM, and they are still going at it being loud. Attached is another video taken at 11:05 PM" (Plaintiff)

96. The HOA never responded.

97. Defendants held a meeting in early November 2020, where Plaintiff was a topic of conversation.

98. On or shortly after that meeting, Defendants made a decision to not renew Plaintiff's lease rather than fix the violations Plaintiff had complained of.

99. On 11-30-2020, an agent for Landlord informed Plaintiff that his lease would not be renewed.

100. Landlord refused to give a reason for why the the lease was not being renewed.

101. On 12-08-2020, Plaintiff sent the following email to Defendants:

> I am writing to you again, about this problem. It feels like you are ignoring my complaints to discourage me from living here. They threw another loud gathering last night with extremely loud talking, they woke my son up at 9:00PM with very loud. This continued until midnight. Not only was it extremely loud and woke my son up on a school night. Their choice of language was again very colorful: "hoe this, fuck that, bitch this, shit that". Again, the problem is the same as last time: they are leaving their screen door open while they are having these gatherings. They may just be fine if they simply closed their door. These people have not been here very long, yet the number of times this has happened is numerous.
>
> I took a 15 minute continuous video shortly after 10 PM if you would like a copy. I need to transcode it as it's 2.5GB, i'll send it later today or tomorrow. It captures both their volume, and their colorful choice of words.
>
> Are you going to handle it this time and enforce your covenants?
>
> Best Regards, -Blake (Plaintiff)

102. The HOA did finally address the noise after 10PM issue, and the language issue, however failed to enforce its covenants about noise levels in violation of City of Tampa ordinances as it's covenants require it to do.

103. Plaintiff sent Landlord a draft of this complaint to try to settle the matter before going to court.

104. Landlord never responded.

# V   CLAIMS FOR RELIEF

## SUPPLEMENTAL BACKGROUND CHECKS

## COUNT I

### *Violation of 15 U.S.C. § 1681 et seq "Fair Credit Reporting Act": Failure to Dispute*

105. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

106. On 04-09-2019, Plaintiff applied to rent Mallory Square Unit C8 from Landlord.

107. On 04-19-2019, Plaintiff was informed by Landlord's agent that HOA had denied his application due to criminal history reported on the background check.

108. Plaintiff promptly filed a dispute for the erroneous background report.

109. On or about 05-14-2019, Defendants forced Plaintiff to pay for and undergo a second criminal background check, after passing the first criminal background check after a successful dispute.

110. Defendants conduct was willful and objectively unreasonable.

111. Despite the successful dispute, Defendants none-the-less took adverse action against Plaintiff by denying his application effectively abrogating Plaintiff's right to dispute inaccurate information on his report in violation of 15 U.S.C § 1681b(3)(B)(IV).

112. The fact that Defendants allowed Plaintiff to re-apply does not abrogate the fact that they illegally denied his first application.

## COUNT II

### *Violation of 15 U.S.C. § 1681 et seq "Fair Credit Reporting Act": Failure to send Denial Letter*

113. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

114. On 04-09-2019, Plaintiff applied to rent Mallory Square Unit C8 from Landlord.

115. On 04-19-2019, Plaintiff was informed by Landlord's agent that HOA had denied his application due to criminal history reported on the background check.

116. Defendants conduct was willful and objectively unreasonable.

117. Prior to adverse action being taken, Defendants failed to a) furnish a copy of the report and b) provide a description in writing of the rights of the consumer as prescribed by the Bureau under section 1681g(c)(3), in violation of 15 U.S.C. § 1681b(b)(3)(A).

## Count III

### *Violation of 42 U.S.C. § 3604 Fair Housing Act: Racial Discrimination*

118. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

119. On 04-09-2019, Plaintiff applied to rent Mallory Square Unit C8 from Landlord.

120. On 04-19-2019, Plaintiff was informed by Landlord's agent that HOA had denied his application due to criminal history reported on the background check.

121. Plaintiff promptly filed a dispute for the erroneous background report.

122. On or about 05-14-2019, Defendants forced Plaintiff to pay for and undergo a second criminal background check, after passing the first criminal background check after a successful dispute.

   (a) The practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective because there is no need for additional background checks if the Plaintiff passed the first.

(b) Additional criminal background checks has a disproportionately adverse effect on African Americans as they are much more likely to have contact with law enforcement and the criminal justice system, and are thus more likely to have erroneous records or records at all.

(c) In 2014, African Americans comprised approximately 36 percent of the total prison population in the United States, but only about 12 percent of the country's total population. In other words, African Americans were incarcerated at a rate nearly three times their proportion of the general population. Hispanics were similarly incarcerated at a rate disproportionate to their share of the general population, with Hispanic individuals comprising approximately 22 percent of the prison population, but only about 17 percent of the total U.S. population. In contrast, non-Hispanic Whites comprised approximately 62 percent of the total U.S. population but only about 34 percent of the prison population in 2014.

(d) Across all age groups, the imprisonment rates for African American males is almost six times greater than for White males, and for Hispanic males, it is over twice that for non-Hispanic White males.

(e) These disparities are further widened by the fact that African Americans and Hispanics are far more likely to rent than own than Caucasians. The part of Tampa where the property resides is the most racially segregated–with the highest percentage of Caucasians–part of Tampa.

(f) There is a robust causal link between additional background checks and charging African Americans higher rental applications as the applicant was forced to pay for the addition background check.

(g) The additional scrutiny also has a chilling affect on African Americans applying for a rental or continuing the rental application after passing the first background check.

(h) The disparity caused by the practice has the significant as it disproportionally

charges African Americans at least double the rental application fee as Caucasian applicants.

(i) There is a direct relation between the additional background check mandated by Defendants and Plaintiff being charged more money for a rental application.

123. Plaintiff was treated differently than other applicants with the terms and conditions of a rental by subjecting Plaintiff to an additional criminal background check that was not required of other applications on the basis of race in violation of 42 U.S.C. § 3604(b).

## RESTRICTING CHILDREN PLAYING OUTSIDE

## COUNT IV
### *Violation of 42 U.S.C. § 3604 Fair Housing Act: Family Discrimination*

124. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

125. On 10-26-2020, Bay Ridge and the HOA enacted a new rule in response to some property damage that was purportedly done by a minority of children: "All children need to be supervised and are not allowed in the pool without an adult" (Linda Lima)

126. Defendants imposed an overly broad and unduly burdensome policy related to children that were not the least restrictive means to ensure safety and enjoyment of the premises by all tenants.

127. As an example of how over broad this policy is, a seventeen year old is currently forbidden from being outside in the pool area unsupervised.

128. This policy had an immediate chilling effect, as most outside play in the common areas ceased.

22

129. Plaintiff's child has special needs, one of the areas he struggles with is social interaction. As a direct result of Defendant's policy, Plaintiff's child has lost opportunities to learn and grow socially as other children are no longer going outside as much to play. Plaintiff's child is an only child and has no other children inside of his home to play with.

130. By enacting such a policy, Defendants discriminated against Plaintiff with the terms, conditions, or privileges based on his familial status, in violation of 42 U.S.C. § 3604(b).

## COUNT V

### *Violation of Fla. Stat. §§ 760.23: Family Discrimination*

131. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

132. The same fact pattern in The previous count also violates Fla. Stat. §§ 760.23(2)

## COUNT VI

### *Violation of 42 U.S.C. § 3604 Fair Housing Act: Family Discrimination*

133. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

134. On or about early August 2020, the HOA issued a noise violation to another unit in building E, for their 7-year old child emitting noise when waking up in the middle of the night with nightmares.

135. Plaintiff's child often has sleep overs in this unit.

136. Plaintiff's child also occasionally wakes up during late hours with nightmares, and emits noises.

137. It is a normal child behavior to occasionally wake up noisily with nightmares.

138. Bay Ridge and the HOA have an unwritten policy–which they have acted on at least twice–of issuing noise violations to children who wake up from nightmares.

139. Plaintiff is under constant threat of being issued a violation for this policy in both his own unit, and other units in the complex where Plaintiff's child may temporarily reside for sleep overs.

140. Such a policy is facially discrimination based on familial status in violation of 42 U.S.C. § 3604(b).

## Count VII
### *Violation of Fla. Stat. §§ 760.23: Family Discrimination*

141. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

142. The same fact pattern in The previous count also violates Fla. Stat. §§ 760.23(2)

## Count VIII
### *Violation of 42 U.S.C. § 3604 Fair Housing Act: Family Discrimination*

143. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

144. Defendant HOA has the following rule:

Children will be the direct responsibility of their parents or legal guardians, including full supervision of them while within Condominium Property and including full compliance by them of these Rules and Regulations and all other rules and regulations of the Association. (Rules and Regulations 23)

145. Defendants imposed an overly broad and unduly burdensome policy related to children that were not the least restrictive means to ensure safety and enjoyment of the premises by all tenants.

146. The rule is so broad, that it even prevents anyone under the age of eighteen from using the common walkways to enter or exit the property without adult supervision.

147. The rule also unnecessarily prevents children from playing outside unless supervised.

148. This policies unlawfully denies children equal use of the property.

149. By enacting such a policy, Defendants discriminated against Plaintiff with the terms, conditions, or privileges based on his familial status, in violation of 42 U.S.C. § 3604(b).

## COUNT IX
### *Violation of Fla. Stat. §§ 760.23: Family Discrimination*

150. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

151. The same fact pattern in The previous count also violates Fla. Stat. §§ 760.23(2)

## VIDEO SURVEILLANCE

## COUNT X
### *Violation of 42 U.S.C. § 3604 Fair Housing Act: Disability Discrimination*

152. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

153. As a direct result of autistic behavior exhibited by Plaintiff–including reporting and investigating noise violations and CDC COVID-19 violations, taking photos in public places, documenting violations–Defendants approved the placement of a video camera pointed at Plaintiff's residence, placing him under 24 hour video surveillance.

154. No other units were placed under video surveillance at this time.

155. Defendants discriminated against Plaintiff in the terms, conditions, or privileges by treating him differently on the basis of disability (ASD) in violation of 42 U.S.C. § 3604(f)(2).

# Count XI

### *Violation of Fla. Stat. §§ 760.23: Disability Discrimination*

156. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

157. The same fact pattern in The previous count also violates Fla. Stat. §§ 760.23(2)

## Audio Sensitivity

# Count XII

### *Violation of 42 U.S.C. § 3604 Fair Housing Act: Disability Discrimination*

158. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

159. Auditory sensitivities are common among people with autism spectrum disorder diagnoses ("ASD").

160. Plaintiff has auditory sensitivities due to ASD.

161. Plaintiff reported multiple noise violations to Defendant's in violation of their own CC&R.

162. Defendants refused to address any of the noise complaints that occurred before 10 PM, that violated their CC&R.

163. Defendants discriminated against Plaintiff on the basis of disability ("ASD") by selectively enforcing their own CC&R, thereby allowing excessive noise to distress autistic residents ("Plaintiff") in violation of 42 U.S.C. § 3604(f)(2).

## COUNT XIII

### *Violation of Fla. Stat. §§ 760.23: Disability Discrimination*

164. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

165. The same fact pattern in The previous count also violates Fla. Stat. §§ 760.23(2)

## ISSUING RETALIATORY VIOLATIONS

## COUNT XIV

### *Violation of 42 U.S.C. § 3617 Fair Housing Act: Interference, coercion, or intimidation*

166. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

167. On 10-27-2020, Bay Ridge sent Plaintiff a notice of violation for purported property damage as referenced above.

168. Defendants knew, or should have known, that that damage has been done the previous week. The board actually lives here.

169. Defendants knew, or should have known, that that Plaintiff's son was too small to dislodge the light post.

170. Defendants knew, or should have known, that that Plaintiff's son is rarely outside.

171. Plaintiff's son has special needs, and would generally refuse to go outside unsupervised.

172. A fireworks safety instructor can count on one hand how many times Plaintiff's son has been outside unsupervised for more than five minutes.

173. Defendants knew, or should have known, that that there are many other children who reside at Mallory Square who likely caused or significantly contributed to the damage.

174. Defendants had scant evidence that Plaintiff's child caused any of the damage–besides the light pole–that he was cited for.

175. Defendants knew that Plaintiff had knowledge of the identifies of the children who did cause the damage, because Plaintiff forwarded Defendants SMS messages that suggested he did. *see* Paragraph 71.

176. Defendants never inquired with Plaintiff about who caused the damage, because the Defendants were never interested in holding those responsible accountable. They were interested in intimidating, harassing, and coercing the Plaintiff.

177. Plaintiff had previously complained about family discrimination for noise complaints of children. *see* ¶ 52

178. Plaintiff had previously raised other FHA complaints such as the 08-21-2020 party.

179. On 08-24-2020, Plaintiff sent an email to Defendants that stated in part:

Forgot to mention: Failure for the HOA to act would also violate Federal, State, and local Fair Housing Act for discrimination based on familial status – foriclby subjecting my child to abuse, profanity, and substance abuse from other residents would have a chilling effect on families wanting to live here and is discriminatory in nature. (Plaintiff)

180. Defendants acted–either jointly or severally–to blame the damage on Plaintiff, and then attempt to charge him for it, in retaliation for the previous complaints.

181. The odds that an entire week passed of other kids pulling and playing on that light post passed, without the HOA or any member issuing a violation for it, then suddenly Plaintiff's child *touches* it and all of a sudden there are photos and violations being sent solely to Plaintiff, is near zero. The only likely possibility is harassment and/or discrimination.

182. Defendants did intimidate or interfere with Plaintiff's enjoyment of the property by issuing by issuing meritless violations in retaliation for Plaintiff raising numerous complaints of FHA violations, in violation of 42 U.S.C. § 3617.

## COUNT XV

*Violation of Fla. Stat. §§ 760.37: Interference, coercion, or intimidation*

183. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

184. The same fact pattern in The previous count also violates Fla. Stat. §§ 760.37

## COUNT XVI

*Violation of 42 U.S.C. § 3617 Fair Housing Act: Interference, coercion, or intimidation*

185. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

186. On 10-27-2020, Plaintiff sent an email to Defendants that stated in part: "I encourage you to seek advice from legal counsel on any communications you send to owners and tenants regarding children. Because this violation runs afoul of a few issues with the fair housing act." (Plaintiff)

187. Soon after, Defendants informed other home owners and tenants that they would not be renewing Plaintiff's lease, so he will not be a problem much longer.

188. On 11-30-2020, Landlord notified Plaintiff–through his Agent–that he would not be renewing Plaintiff's lease. Landlord refused to give a reason why.

189. Defendants did intimidate or interfere with Plaintiff's enjoyment of the property by refusing to renew Plaintiff's lease in retaliation for Plaintiff raising numerous complaints of FHA violations, in violation of 42 U.S.C. § 3617.

## COUNT XVII
### *Violation of Fla. Stat. §§ 760.37: Interference, coercion, or intimidation*

190. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

191. The same fact pattern in The previous count also violates Fla. Stat. §§ 760.37

## DENYING HOUSING

## COUNT XVIII
### *Violation of Fla. Stat. §§ 83.64 Florida Residential Landlord and Tenant Act: Retaliation*

192. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

193. As referenced above, Plaintiff has on many occasions complained to a governmental agency charged with responsibility for enforcement of a building, housing, or health code of a suspected violation applicable to the premises, as protected by Fla. Stat. §§ 83.64(a).

194. As referenced above, Plaintiff has filed numerous complaints with Defendants, exercising his rights under local, state, or federal fair housing laws as protected by Fla. Stat. §§ 83.64(f).

195. As a primary result of these protected actions by Plaintiff, defendants acted–either jointly or severally–to deny Plaintiff housing by refusing to renew his lease.

196. On 11-30-2020, Landlord notified Plaintiff–through his Agent–that he would not be renewing Plaintiff's lease. Landlord refused to give a reason why.

197. As a primary result of these protected actions/complaints by Plaintiff, Defendants acted–either jointly or severally–to reduce services to Plaintiff by refusing to renew his lease, in violation of Fla. Stat. §§ 83.64(1).

## COUNT XIX
### *Violation of Fla. Stat. §§ 760.37: Interference, coercion, or intimidation*

198. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

199. The same fact pattern in The previous count also violates Fla. Stat. §§ 760.37

## VI   REQUEST FOR PRELIMINARY INJUNCTION

200. Plaintiff seeks a preliminary injunction that enjoins Defendants, their agents, employees, and successors and all other persons in active concert or participation with them from:

  (a) Taking any actions that would cause Plaintiff's lease to not be renewed.

  (b) Enforcing their current rules and regulations restricting unsupervised children from the common areas of Mallory Square.

  (c) Enacting or modifying any new rules or regulations that violate the Fair Housing Act.

## Likelihood of Success on the Merits

201. Defendant's children policies cited above, are facially unlawful under the FHA and are indefensible. Defendants did not even attempt to narrow tailor the rules to be age neutral. It is a blanket ban on children outside. Furthermore, given the timings of the events outlined, it is implausible for there to be any reason for Defendant's to refuse to renew Plaintiff's lease, but for retaliation for FHA complaints for defending his rights, and the rights of children at Mallory Square.

## Public Interest and Likelihood of Irreparable Harm

202. In the Eleventh Circuit Court of Appeals, when there is a likelihood of success on a Fair Housing claim, irreparable injury, damage and vindication of the public interest must be presumed

203. In Rogers v. Windmill Pointe Village Club Ass'n, Inc., 967 F.2d 525 (11th Cir. 1992), the Eleventh Circuit held that, "irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes" (citing Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423 (11th Cir. 1984)). "[W]hen a plaintiff who has standing to bring suit shows a substantial likelihood that a defendant has violated specific fair housing statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction remedying those violations." Gresham, 730 F.2d at 1423-1424.

204. The Court in Gresham listed several reasons why housing discrimination results in irreparable injury.

205. First, a person who is discriminated against in the search for housing cannot remain in limbo while a court resolves the matter. He or she must find housing elsewhere, and once that housing is found, it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again. Id. at 1424.

32

206. Second, available housing where the discrimination is occurring could become filled during the pendency of a lawsuit, making corrective relief nearly impossible to enter. Id.

207. Third, monetary relief cannot correct the injury completely. Id.

208. Finally, harm from housing discrimination includes the loss of safe, sanitary, decent housing. Id.

## Balance of Equities and Hardships

209. Defendants are not subjected to any hardships by requiring them to comply with existing discrimination laws. Landlord is in the business of making money, and Plaintiff has always paid his rent as agreed. Defendants will not suffer any financial harm if the relief is granted. Meanwhile, Plaintiff will suffer irreparable injury from the discrimination: without the injunction the court will not be ability to give Plaintiff the relief sought as the lease expires on 04-31-2021.

## VII  Prayer For Relief

Wherefore, Plaintiff prays that the Court enter an order that:

1. Declares that the discriminatory housing practices of Defendants as set forth above violate the Fair Housing Act, as amended, 42 U.S.C. § 3601, et seq.

2. Enjoins Defendants, their agents, employees, and successors and all other persons in active concert or participation with them from discriminating on the basis of familial status, in violation of the FHA.

3. Enjoins Defendants, their agents, employees, and successors and all other persons in active concert or participation with them from taking any actions that would cause Plaintiff's lease to not be renewed.

4. Orders Defendants to take such affirmative steps as may be necessary to restore, as nearly as practicable, the Complainants and all other aggrieved persons to the position they would have been in but for the discriminatory conduct.

5. Orders Defendants to take such actions as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of their unlawful conduct, including implementing policies and procedures to ensure that no applicants or residents are discriminated against because of familial status.

6. Award actual and punitive monetary damages, and attorneys costs and legal costs pursuant to 42 U.S.C. §§ 3613(c)(1) and 3613(c)(2).

7. Award actual or statutory damages–whichever is greater–and punitive damages and attorney fees and legal costs pursuant to 15 U.S. Code § 1681n(a).

8. Award actual, attorney fees and court costs pursuant to 15 U.S. Code § 1681o(a).

9. Award damages pursuant to Fla. Stat. §§ 83.55

10. Award actual and punitive damages, attorney fees and legal costs pursuant to Fla. Stat. §§ 760.35

11. Awards such additional relief as the interest of justice may require.

December 29, 2020
_____

Date

*Blake Warner*
_____

Signature

Blake Warner, Pro Se

3002 W Cleveland Street, #C8

Tampa, FL 33609

E-Service: BLAKE@NULL3D.COM